We'll hear the next case, Mikula v. Romania. Thank you. Good morning, Your Honors. May it please the Court, Ioana Sălejano from Răg, Cusco County, on behalf of the Government of Romania. Your Honors, this case is about the application of the Foreign Sovereign Immunities Act and the interpretation of the ICSID Convention and its corresponding implementing legislation 22 U.S.C.A. 1658. At issue is whether or not the District Court erred in denying Romania's motion, amended motion to vacate and the motion to reconsider when it ruled that it could utilize the summary And when it dismissed without discussion Romania's improper venue argument. Romania's position is that the Court erred under these circumstances. The FISA is clear that it is the sole basis for obtaining jurisdiction over a foreign state in the courts of this country. The only way a federal court can establish subject matter jurisdiction and personal jurisdiction over a foreign state is to comply with the FSIA requirements, including a services process. It also says it's subject to existing treaties? Correct, Your Honor. But nothing in the treaty negates the FSIA requirements. In fact, ICSID's Article 54. But the treaty would allow a summary proceeding? The treaty does not allow a summary proceeding, Your Honor. In fact, the Scanlon case prohibits the Court from using state law summary proceedings. And it's clear that absent an explicit authorization by Congress, federal courts may not adopt state law proceedings. There is absolutely no... ICSID does say it can be brought in any federal court, though, right? It states that the federal courts have jurisdiction. However, the Amarada... Is that subject matter jurisdiction in your view? Yes, Your Honor. However, however, that does not go across the board. And Amarada Hess was clear and clarified that provision that the exclusive jurisdiction over actions and proceedings that is granted in Article 54 does not apply to actions against foreign sovereigns after the passage of the FSIA. But the FSIA specifically excludes treaties and statutory permission granted to effectuate those treaties by its terms, and that would include ICSID, too, right? It doesn't, Your Honor. It doesn't? No. So what it does, there is an exception to immunity that could be alleged. However, the Hess matter also addresses, and the Scanlon case also addresses that. If there is a treaty... If there's an arbitral award exception to the FSIA, we know that, right? I think what the Court is referring to in this instance is whether or not the FSIA applies. Our circumstance is excluded from the FSIA, and that is not the case. And I think specifically... The FSIA says that this won't preclude prior agreements that involve arbitration, right? It doesn't, Your Honor. It doesn't, okay. Section 1604 of the treaty, exception applies only when international agreements expressly What about the 305A6, then? That's also an... That's actually an exclusion that we don't fall under, Your Honor, and that is because there is no conflict. And, in fact, the ICSID Convention Article 55 references Article 54, and it states, Nothing in Article 54 governing recognition or enforcement of an award shall be construed as derogating from law in force in any contracting state relating to immunity of the state or any foreign state from execution. All right. So, A6 of 1605 states that a foreign state shall not be immune from jurisdiction in any case in which the action is brought to confirm an award made pursuant to an agreement to arbitrate. Is that in there? Yes, Your Honor, but we're not asking for immunity. We're asking for the Court to apply the FSIA provisions relating to service. But it's the Foreign Sovereign Immunities Act, isn't it? Correct. But we're not asking... The exception applies only if the international agreements conflict with the immunity provisions of the FSIA, and our position is that there is no conflict, Your Honor, given the fact that 1658 and Scanlon and Hess specifically require and state that the FSIA trumps any provisions that are not clear in the 1658 position in Article 54. Where does that get you anyway? In other words, even assuming you're right and there has to be service, would the end result be any different if we went back to the beginning? Yes, Your Honor. Why would it be different? The reason is, number one, because the law requires it. Number two, in our specific instance, our facts are very precarious. We have a judgment that Romania's position is that it has been paid. On top of that, we have an injunction from the European Commission that requires us to, one, not pay on the award given that... Your arguments were presented by way of a motion to vacate. But the judge didn't consider those arguments, claiming that it was premature and they should be raised at the enforcement level. But that would be the case even if you were served with process in it. That wouldn't be the case, Your Honor, because at that juncture, the purpose of recognizing a judgment is to reach an enforcement level and an execution level. If these arguments were permitted to be raised and Romania isn't attacking the underlying validity of the judgment, it's saying that the judgment exists but the judgment has been paid, and moreover, because it's been paid, I have an injunction from the European Commission asking me to call back the money that I've been paid, then the recognition shouldn't have taken place. Had I been given the opportunity to make these arguments as opposed to an ex parte judgment that was obtained in a few hours, then we wouldn't be subjected to these proceedings. Moreover, we wouldn't have been subjected to numerous... You had a chance to be heard. I agree with that. I understand that on the ex parte application part, but you then had an opportunity to present your arguments to the court by way of the motion to vacate. You would have preferred to have done it in the first instance, but you did have an opportunity to be heard. Is that not so? That is not the case, Your Honor. I didn't have the opportunity to be heard. I had the opportunity for the judgment entry to be reviewed. At that juncture, the district court relied on the very case law that is before this court at this time. It didn't preclude the Mikulas from proceeding with seeking discovery that could create a prejudice. Can I ask you, is there anything different about this case than the Mobile Sarah case that was before a different panel? No. The facts are very similar and the issues are the same. Do they have a comedy issue in that case? I believe that they do. I believe that the United States government, beyond the Department of Justice, was asked to intervene. Then I make this brief on the issue. Thank you. We'll hear from the other side. May it please the Court. My name is Francis Vasquez. I'm here with my colleague, Jacqueline Chung, from the law firm of White and Case. We represent four of the appellees. Also sitting with us is Danforth Newcomb and Joshua Ebersole from the law firm of Sherman and Sterling. They represent the fifth appellee, who is Viorel Mikula. This case is a supplemental . . . Do you agree, by the way, following up on Judge Cerrone's question, that the issues here are the same as presented in the Mobile Cerro case? Yes. As to the operation of the exit convention, whether the FSIA has any applicability, yes. They don't have, in that case, the EU issue and the comedy. Okay. Thank you. This arbitration that's at issue here, that was confirmed by the Court, was originally filed in 2005 and resulted in an award in December of 2013. Just by way of background, Romania petitioned exit under that procedure, which allows a kind of appeal, called an annulment, in 2014. That petition has been subsequently rejected. I think, and I picked up from the panel, there is a way to harmonize the exit convention with the FSIA and the enabling statute, while giving meaning to all of them without looking for an unnecessary conflict. As the Court recognized in Section . . . 28 U.S.C. Section 1604, there is a specific carve-out for treaties that preexisted the FSIA. Now, the FSIA was enacted in 1976, and the exit treaty was enacted in 1966, so it certainly qualifies as a treaty that is excluded under Section 1604. In addition, as Judge Droney pointed out, there is a specific exemption for arbitral awards as well, which gives added weight to the argument. What venue provisions apply? The venue provisions, I believe, are, as you pointed out, written into 1650A itself, because it allows for the bringing of this lawsuit in any of the district courts all across the United States. If you look at the legislative history . . . What are the venue guidelines? Could this have been brought in Montana? Yes, it could have. Yes, it could have. So there's no venue provisions, then, right? I mean, there's nothing . . . you say the FSIA venue provision, which probably would have required this to be filed where it was initially filed in D.C., doesn't apply. The general venue provision of 28 U.S.C. Section 1391 would not apply. It applies to all other cases. And exit does apply, but it says you can file it anywhere. You could file it in Nevada, even though there's no connection with the Nevada District Court. That's your view, right? Yes, it is, Your Honor, because if there were assets in Nevada that Romania owned, you would want to file it there. You wouldn't have to find those to file it there. You could just say, we're going to make it inconvenient. We're going to file this in Hawaii. You could do that, in your view, right? Or in Judge Engelmeyer's view, too, right? Yes, it could be filed. And that was the way the statute was constructed. If you look at the legislative history, it says specifically that this is designed so that not only these awards can be recognized in all 50 states, but also even the territories like Guam and the Virgin Islands. And that is . . . So you could have filed this in Guam? If you needed to, if you wanted to get the judgment registered, recognized in Guam . . . Well, the reason I ask is because of the history here. It was first filed in the district court by one of the brothers, in the district court in D.C., one of the brothers. Then it was filed here in New York. It was filed here in New York after it was dismissed without prejudice in D.C. And the idea is you apply the New York state law approach to filing foreign judgments, which is very helpful to plaintiffs. It's ex parte. So one of the concerns in venue is you don't want forum shopping. What's to prevent a plaintiff from filing this in any of these district courts around the nation that have the most generous registration provisions in their own state law? Is there any protection against that? No, but the statute was intentionally written that way because the idea behind the Ixod Convention itself is that the award would be good all over the country that acceded to the Ixod Convention like the United States did. And the United States designated its federal courts as the place to do that. So if the United States had wanted it only to be in a particular court, it would have said that in the statute, but instead it said all of the district courts, and that was very much intended to be allowed to register this as a judgment in any of those courts. And apply the state law of those courts? It would apply the procedures that went on. And I think there's, we're back in 1966 at the time, and in that era you're still just getting the federal rules of civil procedure. You don't have a Foreign Sovereign Immunities Act. There are many varied procedures all over the country for these kinds of actions. This is traditionally an area that state courts and state law deals with. I gather you would file only in the districts where there are assets, right? You wouldn't file in Montana if there were no assets? Or would there be a reason to file in Montana? I can't think of any reason to file in Montana, other than my family lives there. But that's not irrelevant. That's irrelevant to this. But the reason for getting a judgment is the next step, the enforcement part, and so you would do it where you could reach assets, presumably. Yes, and obviously you could get the judgment in one jurisdiction and then register it in other ones as well. So it's really... So then you could get the federal judgment in Montana, bring it to the Southern District of New York, and just register it under the federal statute, right? Yes, this is designed to be a summary process. That's the purpose of the convention and the purpose of 1650A, that this treaty wanted to give these kinds of awards special status, not just as a regular arbitral award that would be taken care of under the Federal Arbitration Act, and it specifically said, no, no, no, we're going to treat these as if they're judgments, entitled to full faith and credit as a substantive matter, and so we are going to let claimants with awards come and enforce these wherever they feel they need to in the district courts of the United States of America. On the second issue, you know, comedy, active state, et cetera, it is a little troubling that we're being asked to recognize a judgment that the European Commission has said that Romania cannot pay. How do we deal with that? I think you deal with it by looking at what the United States agreed to and what it didn't agree to. The United States signed up for the exit convention. The United States is not a member of the European Union, and so whether European Union law has some problem with this award really is not something that we just ignore it. I mean, someone earlier in one of the other cases referred to Iraq in a hard place, and that's certainly where Romania is at the moment. True? I would disagree because I think this is helpful to Romania, that the EU and Romania are aligned in making it possible for Romania not to pay this award. The procedure that is governing the EU, the EU procedure is still ongoing, by the way. No decision right on the appeal? Yeah, there's still another submission to be made in October and then another decision to be had. And that would be the end of it? That's the highest court in the EU? I believe so after that. Any idea when we might expect that to be completed? Probably not until sometime next year. Just in closing, I wanted to give the Court a citation that is not in our brief because it goes to the 1604 carve-out issue, and the case is a Second Circuit case called 767 Third Avenue Associates, 988 F. 2nd, 295, decided in 1993, and it addresses that issue in the context of a different treaty, which you'll see how the Second Circuit has treated that clause in the past and dealt with that. And if there's no further questions, then I'll be finished. Thank you. Thank you. We'll hear the rebuttal. Your Honors, I would like to address two issues. Number one, the venue provision. There's nothing in ICSID limiting or restricting or enhancing the venue. However, 1391F is clear that the proper venue is in the D.C. District, unless a substantial part of the events or omissions giving rise to the claim occurred in another district. And it's important to note that this case was started in D.C. And the D.C. judge rejected the petition on the grounds that all defendants, all plaintiffs must participate, all claimants must participate, and that they cannot proceed on an ex parte basis. And the transcripts of that decision, Your Honor, indicate that counsel for Burel indicated that he represented all claimants. And it's hard to believe that he didn't in light of the fact that the award is collective. It was without prejudice, though, right? Without prejudice, Your Honor. And despite that, two or three days later, they came into the District Court where it was a favorable decision that was rendered the same day that the petition was filed. Number two, in terms of the European Commission, the United States government in the Venezuela case was asked to chime in on its position. It's hard to believe that the United States government doesn't care how these proceedings, how ex parte proceedings are affecting the U.S. government, which is a party to the exit. It's hard to believe that Congress intended that ex parte proceedings are permissible in instances where the United States government would be a defendant in a case. It's hard to imagine that Congress would have intended that the United States government be subjected to an ex parte proceeding in an instance such as this where there's a payment that's alleged to be made in full and a clawback provision from another governing body, entity, country. It's hard to believe that the Congressional intent was that plenary proceedings are not the appropriate route to go in recognizing exit awards, especially if the U.S. government would be a party to such a case. Thank you. Thank you, Your Honor. Will reserve the decision.